IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MONY LIFE INSURANCE          :
COMPANY,                     :
          Plaintiff      :
                                        :  CIVIL NO. 1:CV-15-2109
     vs.                    :
                                          :  (Judge Caldwell)
CAROL SNYDER, f/k/a CAROL     :
ECKERT, and PAMELA ECKERT,    :
          Defendants     :

*M E M O R A N D U M*

I.  *Introduction*

        Plaintiff, MONY Life Insurance Company ("MONY"), filed this interpleader action to resolve which of the defendants is entitled to the proceeds of an insurance policy MONY issued on the life of Steven Eckert (the "Insured"). Defendants are Carol Snyder ("Snyder"), the Insured's ex-wife, and Pamela Eckert ("Eckert"), his widow. Snyder has apparently always been the named beneficiary, and in September 2014 the Insured transferred ownership of the policy to her about a year before his death.

        We have before us: (1) MONY's motion for summary judgment which seeks judgment on the counterclaims Eckert filed against it and discharge from this action once it pays the policy proceeds into court; (2) Snyder's motion for summary judgment on the crossclaims Eckert filed against her and an order requiring MONY to pay her the policy proceeds; and (3) Eckert's motion for partial summary judgment for a determination that

the Insured suffered from a weakened intellect and was in a confidential relationship with Snyder at the time the Insured transferred ownership of the policy to Snyder.

II. *Standard of Review*

Fed. R. Civ. P. 56 governs the grant of summary judgment. The moving party is entitled to summary judgment if he "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). "Material facts are those that could affect the outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017)(citation omitted).

In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The non-moving party cannot rest on mere pleadings or allegations," *El v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). "To survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions . . . .'" *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)(cited case omitted). "'[C]onclusory, self-serving

affidavits are insufficient to withstand a motion for summary judgment.'" *Blair, Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)(cited case omitted).

We "must view all evidence and draw all inferences in the light most favorable to the non-moving party" and we will only grant the motion "if no reasonable juror could find for the non-movant." *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

III. *Background*

The following is the record for the purposes of the parties' motions for summary judgment, based on their statements of material facts and counter-statements, along with the evidence submitted in support. We will sometimes borrow the parties' language without attribution. When we cite to only one party's statement, or counter-statement, of material fact, we do so because the other party has admitted the relevant statement.

A. *Snyder and the Insured's History*

On or about July 30, 1985, the Insured submitted an application for a life insurance policy with MONY. (Doc. 68-1, ECF p. 20, application). On the application, the Insured named "Carol Eckert Spouse" (now Carol Snyder) as the beneficiary of the proposed policy. (Doc. 68-1, ECF p. 17). On or about July 30, 1985, MONY issued the policy with a face amount of $127,000 insuring the life of the Insured. (Doc. 68-1, ECF p. 2).

On or about March 9, 1989, Snyder and the Insured were divorced.  (Doc. 68-2, ECF pp. 5-6, decree of divorce).  As part of the divorce, a property settlement agreement, dated January 12, 1989, divided the marital property between the Insured and Snyder.  (Doc. 68-2, ECF pp. 7-19).  Neither the divorce decree nor the property settlement agreement specifically addressed the policy.  The Insured did not change the beneficiary election at the time of the divorce.  (Doc. 58, Snyder's statement of material facts (SSMF) ¶ 7, citing the complaint ¶ 9, and Snyder's answer (Doc. 8) to the complaint ¶ 9, and Eckert's answer (Doc. 48) to the complaint ¶ 9).

The Insured married Eckert in 2011.  (Doc. 58, SSMF ¶ 9; Doc. 80-2, Eckert's revised statement of material facts (ESMF) ¶ 17).  On June 23, 2011, the Insured wrote a will naming Eckert as primary beneficiary.  (Doc. 80-3, ECF pp. 141-45).

Following his divorce from Snyder, the Insured maintained a fond relationship with her — they would visit, correspond, talk on the phone, and manage his health care together.  (Doc. 58, SSMF ¶ 8; Doc. 80-2, ESMF ¶ 2).  The friendly contact between the Insured and Snyder continued, even after the Insured married Eckert.  However, Snyder was no longer involved with the Insured's health care or his financial affairs after he began his relationship with Eckert in or around 2010.  (Doc. 58, SSMF ¶ 10 and citations to the record specified therein).  As Eckert herself admits, "After their divorce, from time to time he allowed her to continue to manage his financial affairs until his marriage to" Eckert.  (Doc. 48, Eckert's Second Am. Answer ¶ 43).  And as Eckert

also admits, "Snyder took" the Insured for "various medical visits" but only "between 2000 and 2010." (Doc. 80-2, ESMF ¶ 3).

During an unspecified time period, someone other than the Insured would write a significant number of his checks, including Snyder. (Doc. 58-9, ECF pp. 13-15, Snyder Dep.).

On October 7, 2005, the Insured signed a release for his health insurance company, giving Snyder the right to get information about him. (Doc. 80-2, ESMF ¶ 10, admitted by Snyder). On May 30, 2006, the Insured authorized one of his physicians, Dr. Moorthy, to speak with Snyder rather than communicate with him directly about his medical care. (Doc. 80-2, ESMF ¶ 9, admitted by Snyder).

In 2006, the Insured signed a power of attorney naming Snyder as his agent. (Doc. 80-2, ESMF ¶ 11, admitted by Snyder). On January 18, 2006, Snyder picked up the Insured's power of attorney from his lawyer, Dorothy Livaditis. (Doc. 80-3, ECF p. 73). Snyder would accompany the Insured to his attorney's office and met with the lawyer but would not attend meetings where the Insured made changes to his will. (Doc. 58-9, ECF pp. 12-13, Snyder Dep.).

Snyder wrote a chronology of the Insured's history for him. That history refers repeatedly to his confusion in 2002 – 2006. (Doc. 80-2, ESMF ¶ 15, admitted by Snyder.)

On May 24, 2013, the Insured again signed a power of attorney naming Snyder as his agent. (Doc. 80-2, ESMF ¶ 23, admitted by Snyder).

On August 26, 2013, the Insured and Snyder called MONY together, but Snyder cannot recall if it was about a third-party release form. (Doc. 58-9, ECF p. 31, Snyder Dep.).

In 2014, the Insured gave Snyder a prenuptial agreement, all his wills, and his personal papers to hold for him. (Doc. 58-9, ECF pp. 16, 41).

Snyder sent the Insured a series of notes and cards which said things like, "you are back in my life in a big way, and I intend to keep you there forever, You are and always will be the best person in my life . . . Remember we are together forever" (Doc. 80-3, ECF pp. 74-93).

B. *The July 29, 2014, evaluation of the Insured*

On July 29, 2014, the Insured was evaluated by Dr. Lawrence McCloskey, a neuropsychologist. Limited as his examination was, the doctor could find no clear evidence for dementia. (Doc. 76-4, ECF p. 7, Dr. McCloskey evaluation). The Insured told the doctor that his wife paid the bills and managed his medication and medical appointments. (Doc. 76-4, ECF p. 3, Dr. McCloskey evaluation). He was unsure why he had carried a portable oxygen tank for the last couple of years. (Doc. 76-4, ECF p. 3, Dr. McCloskey evaluation). He was dependent on others to take medication and interface with his physicians. (Doc. 76-4, ECF p. 3, Dr. McCloskey evaluation). He was "unconcerned" about his decline in memory. (Doc. 76-4, ECF p. 4, Dr. McCloskey evaluation).

Dr. McCloskey also reported that the Insured was:

> a poor historian only for his illnesses and treatments, about which he professed not to care in the least. Otherwise, he told a very cogent story. Moreover, he remembered very well his wife's intended movements when the time came to pick him up.

(Doc. 76-4, ECF p. 5, Dr. McCloskey evaluation).

> Dr. McCloskey further wrote:
>
> Given his hasty, careless approach and his openly dismissive attitude toward the tests, I am impressed that he did fairly well on a number of them. Between tests, and during the interview, his memory seemed sharp for what he wanted to remember, such as his wife's errand toward the end of the examination. He seemed quite a good historian, except regarding his medical history . . .

(Doc. 76-4, ECF p. 7, Dr. McCloskey evaluation).

Dr. McCloskey noted: "His attitude toward the testing was cavalier and dismissive. Therefore, I really cannot trust my results." (Doc. 76-4, ECF p. 5, Dr. McCloskey evaluation).

At this evaluation, Eckert told Dr. McCloskey that the Insured's memory had been progressively declining for two years. He was frequently repeating himself, forgetting names, appointments, plans and events; misplaced objects and lost track of large sums of money. She stated that he forgot he had a bank account containing $150,000. He seemed unable to understand bills and paperwork even as well as he used to. He had a decreased interest in going out. (Doc. 76-4, ECF p. 4, Dr. McCloskey evaluation).

On September 25, 2014, both the Insured and Eckert expressed that the July 29 evaluation was fair and were "happy" that the Insured did not have dementia. (Doc. 58-3, ECF p. 123, Eckert Dep.; Doc. 58-14, ECF p. 1). Eckert never sought to have the Insured declared incapacitated and unable to handle his own affairs, and he was never so adjudicated. (Doc. 58-3, ECF p. 21, Eckert Dep.).

           C. *The circumstances of the transfer of ownership of the MONY policy*

MONY Life Insurance Company was acquired by AXA Advisors sometime prior to September 2014. (Doc. 58-11, ECF p. 3, Wilbert Dep.; Doc. 58-12, ECF p. 4, Goetz Dep.). Andrew Goetz and Patrick Wilbert were AXA advisors, and as part of their job responsibilities, they serviced MONY policies. (Doc. 58-11, ECF pp. 3-4, Wilbert Dep; Doc. 58-12, ECF p. 5, Goetz Dep; Doc. 86, Eckert's supplemental brief with attached exhibit). MONY policies no longer had MONY agents to service them, so Goetz and Wilbert were assigned "orphan" MONY policies. (Doc. 58-12, ECF pp. 3, 5 Goetz Dep.). The Insured's policy was assigned to Goetz as one of those orphan policies. (Doc. 58-12, ECF p. 10, Goetz Dep.).

Goetz and Wilbert handled these orphan policies in the following way. Goetz would call the owner of the policy to set up a meeting. (Doc. 58-12, ECF pp. 5-6, 7, Goetz Dep.). At the meeting, the owner would be accurately advised on changes or modifications that could be made in the policy, but changes were not made if they were not needed. (Doc. 58-12, ECF p. 6, Goetz Dep.). Goetz and Wilbert worked strictly on a

commission basis, and if they gained the customer's trust, they were more likely to buy other insurance products from them. (Doc. 58-12, ECF p. 6, Goetz Dep.). According to Goetz, they "would only do what was better for the client, whatever that was. Whether it was good for us or not, it didn't matter. We were building the trust." (Doc. 58-12, ECF p. 8, Goetz Dep.).

After the owner agreed to a meeting, Goetz and Wilbert would be prepared to offer options. (Doc. 58-12, ECF p. 8, Goetz Dep.). The meeting would be for information gathering. (Doc. 58-12, ECF p. 8, Goetz Dep.). Sometimes the paperwork would be filled out at the first meeting. Normally, however, they would "go back," "run some things," "get all their health information on the owner," and then come back to the owner, and go forward. (Doc. 58-12, ECF p. 8, Goetz Dep.). It might be a third or fourth meeting before an application was taken. (Doc. 58-12, ECF p. 9, Goetz Dep.).

On August 30, 2014, Goetz called Snyder at her home. (Doc. 58-9, ECF p. 42, Snyder Dep.). The call lasted about eleven minutes. (Doc. 58-9, ECF p. 28, Snyder Dep.). Snyder said they called her because they were trying to contact the Insured and her number was the only one they had. (Doc. 58-9, ECF pp. 9, 28, 42, Snyder Dep.). She gave him the Insured's phone number. (Doc. 58-9, ECF p. 42, Snyder Dep.). She does not recall what else they talked about. (Doc. 58-9, ECF p. 28, Snyder Dep.). Goetz does not recall the phone call or how he would have had Snyder's telephone number at the time. (Doc. 58-12, ECF p. 14, Goetz Dep.).

Sometime before September 4, 2014, Goetz called the Insured to arrange a meeting to review the policy. This was his first contact with the Insured. (Doc. 58-12, ECF p. 11, Goetz Dep.; Doc. 58-11, ECF p. 5, Wilbert Dep.). The meeting was held on September 4, 2014, with the Insured, Goetz and Wilbert attending. (Doc. 58-12, ECF pp. 11, 13, Goetz Dep.; Doc. 58-11, ECF p. 5, Wilbert Dep.). Snyder was not present. (Doc. 58-12, ECF p. 13, Goetz Dep.; Doc. 58-11, ECF p. 6, Wilbert Dep.; Doc. 58-9, ECF p. 27, Snyder Dep.). Wilbert only met with the Insured one time. (Doc. 58-11, ECF pp. 5, 13, Wilbert Dep.). As far as the Insured was concerned, Wilbert was a stranger to him. (Doc. 58-11, ECF p. 15, Wilbert Dep.).

When the Insured answered the door for the meeting, he was using oxygen, with two tubes in his nostrils, and Wilbert and Goetz realized they would not be selling him any life insurance products. (Doc. 58-11, ECF p. 6, Wilbert Dep.). According to Wilbert, the Insured said he was worried that Snyder would not receive the proceeds of the MONY policy. As a solution, Wilbert recommended a change in ownership so that it would be Snyder's property. The idea did not come from the Insured nor did he mention a change in beneficiary. (Doc. 58-11, ECF p. 7, Wilbert Dep.).

At the meeting, Wilbert and Goetz did try to sell the Insured an annuity from the Delaware Life Insurance Company with Carol Snyder as the beneficiary. (Doc. 58-11, ECF p. 9, Wilbert Dep.). The annuity was Wilbert's idea. (Doc. 58-11, ECF p. 14, Wilbert Dep.). The Insured said he had sold his used-car inventory for $300,000,[1] and

---

[1] The Insured used to operate a used-car business.

he wanted Snyder to get that money. The annuity application was never signed. (Doc. 58-11, ECF p. 9, Wilbert Dep.). Wilbert followed up with Snyder with two or three phone calls, but there was not much interest in proceeding so he stopped calling after that. (Doc. 58-11, ECF pp. 9, 14, Wilbert Dep.).

Neither Wilbert nor Goetz sold MONY life insurance products. (Doc. 58-11, ECF p. 4, Wilbert Dep.; Doc. 58-12, ECF p. 7, Goetz Dep.). MONY did not make such products. (Doc. 58-11, ECF p. 16, Wilbert Dep.; Doc. 58-12, ECF p. 9, Goetz Dep.). Neither Wilbert nor Goetz attempted to sell a MONY product to the Insured. (Doc. 58-11, ECF p. 14, Wilbert Dep.; Doc. 58-12, ECF p. 21, Goetz Dep.).

Neither Wilbert nor Goetz thought that the Insured had any mental impairment when they met with him. Wilbert testified that he had obvious physical problems but that the Insured was thinking quickly, was very coherent, and had no cognitive impairment. (Doc. 58-11, ECF pp. 13, 16, Wilbert Dep.). Goetz said that while he saw him with oxygen, he was "very coherent, very together . . . explained himself well and spoke fine . . ." (Doc. 58-12, ECF pp. 13, 18, Goetz Dep.). They made no inquiries into the Insured's financial condition or medical condition at the meeting. (Doc. 58-11, ECF p. 6, Wilbert Dep.).

After the September 4, 2014, meeting, either Wilbert or Goetz called Snyder and told her the Insured wanted to transfer ownership of the MONY policy to her. (Doc. 58-9, ECF p. 31, Snyder Dep.). Wilbert prepared a transfer of ownership form for the policy, the "change form," by typing in some information about Snyder, including her

name ("Carol Snyder"), relationship to the Insured ("ex-wife"), date of birth, phone number, and address. He transmitted the form to Snyder. (Doc. 68-2, ECF p. 3, change form; Doc. 58-11, ECF pp. 7-8, Wilbert Dep.; Doc. 58-9, ECF p. 32, Snyder Dep.).

The Insured had requested that Wilbert and Goetz communicate directly with Snyder about the policy and the change form because the Insured did not want Eckert to find out he was changing the ownership to Snyder. (Doc. 58-9, ECF pp. 29, 31, 32, Snyder Dep.; Doc. 80-2, ESMF ¶ 50). This request was made even though the Insured had a fax at his used-car lot and Eckert was out of town. (Doc. 58-9, ECF p. 32, Snyder Dep.).

The day after the meeting, on September 5, 2014, the Insured asked Snyder and her sister, Kathy Frigm, to meet for dinner at a restaurant to execute the change form. (Doc. 58-7, ECF p. 15, Frigm Dep.; Doc. 58-9, ECF pp. 33, 42, Snyder Dep.). At the restaurant, the Insured signed the change form in the presence of Snyder and Frigm. (Doc. 58, SSMF ¶ 24; Doc. 80-2, ESMF ¶ 51). Snyder also signed the form, after which she transmitted the executed form back to Wilbert and Goetz. (Doc. 58, SSMF ¶ 25; Doc. 80-2, ESMF ¶ 54). On September 9, 2014, Wilbert faxed the change form to MONY. (Doc. 68-2, ECF pp. 2-3). Frigm said that she saw no mental or intellectual impairment on the Insured's part at that time. (Doc. 58-7, ECF p. 14, Frigm Dep.). Both Snyder and Frigm saw the Insured using oxygen from a cannister. (Doc. 58-9, ECF p. 33, Snyder Dep.; Doc. 58-7, ECF p. 11, Frigm Dep.).

Neither Wilbert nor Goetz ever received any compensation in connection with the change of ownership. (Doc. 58-11, ECF p. 14, Wilbert Dep.). Wilbert believed the Insured wanted the change in ownership and Wilbert had no reason to suggest anything the Insured did not want as Wilbert was not going to make a sale or have any official connection to the Insured. (Doc. 58-11, ECF p. 15, Wilbert Dep.).

Eckert was out of the country on vacation at the time of the September 4, 2014, meeting and the Insured's subsequent dinner with Snyder and Frigm. (Doc. 58-6, ECF p. 15, Suzanne Eckert Dep; Doc. 58-3, ECF p. 42, Eckert Dep.; Doc. 58-7, ECF p. 11, Frigm Dep.). Snyder knew Eckert was not in town at this time. (Doc. 58-9, ECF p. 29, Snyder Dep.).

### D. *Other evidence*

Eckert stated that she always knew that Snyder was the beneficiary of the MONY policy. (Doc. 58-3, ECF pp. 33-34, Eckert Dep.). She did not press the Insured about it; they did discuss it but not in the last two years before his death. (Doc. 58-3, ECF p. 34, Eckert Dep.). Snyder was at one time the beneficiary of the Insured's Prudential life insurance policy and at another time the Insured's estate was the beneficiary. Then Eckert was the beneficiary, and she received the proceeds of that policy. (Doc. 58-3, ECF p. 38, Eckert Dep.).

On May 23, 2014, the Insured executed a will naming Eckert as executrix and beneficiary of 50% of his estate. (Doc. 80-3, ECF pp. 148-52). On May 23, 2014, he also signed a power of attorney prepared by Dorothy Livaditis, Esq., naming Eckert as

his agent.  (Doc. 80-3, ECF pp. 103-111).  Eckert testified that the Insured "didn't trust anybody  hardly," except Lois Young from Prudential, "but he had been with her for 30 years."  (Doc. 58-3, ECF p. 39, Eckert Dep.).

Steve McLane, the Insured's friend who also worked on automobiles for him, testified that the Insured told him after the September 4, 2014, meeting that he was going to transfer ownership of the policy to Snyder.  The Insured also told him why he was doing it, that at that time Eckert had power of attorney for the Insured and he wanted to make sure Snyder got the policy so that the beneficiary could not be changed. McLane said the Insured knew what he was doing.  (Doc. 58-5, ECF pp. 3, 12-13, McLane Dep.).  McLane also testified that the Insured had seizures "here and there" and memory problems "here and there," but he had a "sharp mind" until the day he died. "[H]e [knew] what he was doing," in McLane's opinion.  (Doc. 58-5, ECF p. 13, McLane Dep.).

### E.  *Telephone calls before and after the transfer of ownership*

On September 2, 2014, Snyder called the Insured at 12:09 p.m. and the call lasted about fourteen minutes.  (Doc. 58-9, ECF pp. 28-29, Snyder Dep.).  They talked about his taking her and Frigm out to dinner.  (Doc. 58-9, ECF pp. 28-29, Snyder Dep.).  On September 4, 2014, at 10:27 a.m., Snyder called the Insured again.  (Doc. 58-9, ECF p. 29, Snyder Dep.).  Later that day, there were three calls from AXA Advisors to Snyder, at 3:16 p.m., 4:26 p.m. and 4:31 p.m., totaling twenty-four minutes.  (Doc. 58-9,

ECF p. 29, Snyder Dep.). Snyder said they called to tell her what the Insured wanted to do, to make her the owner of the policy and make her the beneficiary of an annuity. (Doc. 58-9, ECF p. 29, Snyder Dep.). She could not say why it took three calls to accomplish that. (Doc. 58-9, ECF p. 29, Snyder Dep.).

On September 5, 2014, Snyder called Goetz's cell phone at 11:25 a.m. (Doc. 58-11, ECF p. 10, Wilbert Dep.). Wilbert does not know anything about that call. (Doc. 58-11, ECF p. 10, Wilbert Dep.). On September 8, 2014, there was a call from the AXA advisors number to Snyder's cell phone at 12:30 p.m. (Doc. 58-11, ECF p. 10, Wilbert Dep.). Wilbert said that was most likely him following up on the change form he had faxed to Snyder on September 5. (Doc. 58-11, ECF p. 10, Wilbert Dep.). On September 8, 2014, at 4:25 p.m., there was another call from AXA Advisors to Snyder's home phone that lasted twelve minutes. Wilbert said it may have been to discuss the annuity with her. (Doc. 58-11, ECF p. 10, Wilbert Dep.). On September 8, 2014, at 7:19 p.m., Snyder faxed a document to AXA Advisors. (Doc. 58-11, ECF p. 10, Wilbert Dep.). Wilbert does not know what that was. (Doc. 58-11, ECF p. 10, Wilbert Dep.).

On September 9, 2014, at 12:15 p.m., there was a call from AXA Advisors to Snyder's home that lasted seven minutes. (Doc. 58-11, ECF p. 10, Wilbert Dep.). Wilbert did not know what it was about specifically, but he knew he followed up to find out from her if the Insured wanted to proceed with the annuity since the Insured had asked him to communicate through her. (Doc. 58-11, ECF p. 10, Wilbert Dep.). Shortly after this call, Snyder sent a fax to AXA Advisors. (Doc. 58-11, ECF p. 10, Wilbert Dep.).

Wilbert does not recall what this was about except that there may have been some supporting documentation necessary for the change form. On September 9, 2014, there was a call from AXA Advisors to Snyder's home at 2:49 p.m. (Doc. 58-11, ECF p. 10, Wilbert Dep.). Wilbert does not recall what this was about except that he was following up with her about the annuity. (Doc. 58-11, ECF p. 10, Wilbert Dep.).

On September 15, 2014, at 4:12 p.m., Snyder called Goetz. (Doc. 58-11, ECF p. 10, Wilbert Dep.). Wilbert does not know what that call was about. (Doc. 58-11, ECF p. 10, Wilbert Dep.). On the same day, at 4:43 p.m., there was a call from AXA Advisors to Snyder's home that lasted five minutes. (Doc. 58-11, ECF p. 10, Wilbert Dep.). Wilbert thought that it was his call, but does not know what it was about. (Doc. 58-11, ECF p. 10, Wilbert Dep.). On September 16, 2014, at 6:01 p.m., there was a call from AXA Advisors to Snyder's home that lasted three minutes. (Doc. 58-11, ECF pp. 10-11, Wilbert Dep.). Wilbert does not recall what it was about. (Doc. 58-11, ECF p. 11, Wilbert Dep.). Shortly thereafter, AXA Advisors faxed a document to Snyder. (Doc. 58-11, ECF p. 10, Wilbert Dep.). Wilbert believes it was the annuity application. (Doc. 58-11, ECF p. 11, Wilbert Dep.). Shortly thereafter at 6:45 p.m., Snyder faxed a document to AXA Advisors. (Doc. 58-11, ECF p. 11, Wilbert Dep.). Wilbert said the only fax he remembered receiving was the change form, but there may have been some supporting documentation MONY needed; Wilbert does not recall what the fax was about. (Doc. 58-11, ECF p. 11, Wilbert Dep.).

On September 25, 2014, there was a call from AXA Advisors to Snyder's home. (Doc. 58-11, ECF p. 11, Wilbert Dep.). Wilbert said it was most likely a follow-up for the annuity. (Doc. 58-11, ECF p. 11, Wilbert Dep.). On September 26, 2014, there was a call from AXA Advisors to Snyder's home. (Doc. 58-11, ECF p. 11, Wilbert Dep.). Wilbert said it was again probably about the annuity. (Doc. 58-11, ECF p. 11, Wilbert Dep.).

On September 29, 2014, at 12:27 p.m., there was another call from AXA Advisors to Snyder's home. (Doc. 58-11, ECF p. 11, Wilbert Dep.). Wilbert was not sure what it was about. (Doc. 58-11, ECF p. 11, Wilbert Dep.). On September 29, 2014, at 3:19 p.m., there was a call from Goetz's cell phone to Snyder's home. (Doc. 58-11, ECF p. 11, Wilbert Dep.). Wilbert did not know about that contact. (Doc. 58-11, ECF p. 11, Wilbert Dep.). On September 30, 2014, at 12:27 p.m., there was another phone call from AXA Advisors to Snyder's home. (Doc. 58-11, ECF p. 11, Wilbert Dep.). Most likely it was Wilbert following up on the annuity. (Doc. 58-11, ECF p. 11, Wilbert Dep.).

On November 5, 2014, there was a call from Snyder's cell phone to Goetz's cell phone and then a return call from Goetz on the same day. (Doc. 58-11, ECF p. 11, Wilbert Dep.). Wilbert did not know what that was about. (Doc. 58-11, ECF p. 11, Wilbert Dep.).

The Insured also talked to Snyder using McLane's phone. Between August and September 2014, there were nine calls between Snyder's phone and McLane's phone. There were ten calls in November 2014 between the two phones. McLane is not

sure how many of the calls were between Eckert and the Insured, but at least some of them were.  (Doc. 58-5, ECF pp. 32-33, McLane Dep.).

F. *Evidence bearing on the Insured's mental state*

Suzanne Eckert, the Insured's sister, testified that the Insured did not suffer from memory loss.  (Doc. 58-6, ECF p. 7, Suzanne Eckert Dep.).  In September 2014, the Insured conversed normally and understood what she was saying.  His responses were consistent and appropriate with the conversation.  She had no concerns about whether he understood what he was doing and he could handle his own affairs.  He was physically, but not mentally, limited.  (Doc. 58-6, ECF pp. 15-16, Suzanne Eckert Dep.).

Richard Eckert, the Insured's brother, testified that he had "weekly, sometimes daily" conversations with him in the last two years of his life, that they spoke frequently regarding financial and estate planning and that the Insured understood what he was doing.  "He couldn't read very well, but he was always very sharp."  (Doc. 58-8, ECF pp. 4-5, Richard Eckert Dep.).  The Insured would not have been capable of filling out the change from but would have understood what he was doing if he instructed someone else to change the ownership on the policy.  (Doc. 58-8, ECF pp. 8-9, Richard Eckert Dep.).

The Insured told Richard Eckert that he wanted to leave some money to Snyder and was going to make her a beneficiary of one of his policies.  (Doc. 58-8, ECF p. 6, Richard Eckert Dep.).  However, he and the Insured discussed repeatedly that ownership of the policy should be retained so that at the end of your life, if it was needed,

you could cash out the policy.  In Richard Eckert's view, the Insured would never have

transferred the policy to anybody.  (Doc. 58-8, ECF p. 17, Richard Eckert Dep.).

### G. *The Insured's federal income tax returns*

The Insured's federal income tax returns show the income and loss for the

following years: (a) 2007-income of $15,468; (b) 2008-income of $11,213; (c) 2009-

income of $13,790; (d) 2010-income of $8,174; (e) 2011-income of $1,903; (f) 2012-loss

of $41, 454, (g) 2013-loss of $160,064; (h) 2014-loss of $186,128; and (I) 2015-loss of

$160,000.  (Doc. 80-3, ECF pp. 179-87).

### H. *Discovery of the change in ownership*

Around September 2015, the Insured and Eckert purchased two

condominiums, and the Insured mentioned the MONY policy as a source of cash for the

purchase.  (Doc. 58-3, ECF p. 10, Eckert Dep.).  Eckert called MONY on September 8,

2015, and they discovered the change in ownership.  (Doc. 58-3, ECF p. 10, Eckert

Dep.).

On September 9, 2015, Eckert sent a fax to MONY stating that the Insured

did not remember signing or turning the account over to Snyder and that the Insured was

"very ill" and had "dementia."  (Doc. 80-3, ECF p. 191, fax message).

On September 17, 2015, the Insured sent a fax, written by Eckert, to MONY

stating in part that he did not knowingly transfer ownership of the policy to anyone,

including Snyder, and that they were contesting the transfer.  He stated that he would not

have turned over ownership of the policy to anyone as he "was thinking about cashing it in," mentioning that he had just purchased a home in an over-55 community. (Doc. 80-3, ECF p. 192-93, fax message; Doc. 58-3, ECF p. 11, Eckert Dep.).

On September 28, 2015, the Eckerts' attorney faxed a letter to MONY, asserting that the Insured did not remember executing the change form and that the signature on the form did not appear to be his. (Doc. 80-3, ECF p. 196, letter).

Suzanne Eckert, the Insured's sister, testified that after Eckert learned in September 2015 of the change in ownership, the Insured told her that he had signed the policy over to Snyder to ensure that she would get the benefit and that Eckert would not be able to use her power of attorney to change the beneficiary or cash in the policy. (Doc. 58-6, ECF pp. 12, 15, 17, Suzanne Eckert Dep.).

McLane testified that after Eckert discovered the ownership change, the Insured asked McLane to give Snyder "a heads-up" that the Insured and Eckert would be calling her regarding the policy. He did not indicate that he wanted the policy back from Snyder. (Doc. 58-5, ECF p. 10, McLane Dep.).

In 2015, the Insured told Richard Eckert, his brother, that he had not changed the ownership of the policy. (Doc. 58-8, ECF p. 7, Richard Eckert Dep.). According to Richard Eckert, the Insured was very upset. (Doc. 58-8, ECF p. 7, Richard Eckert Dep.). The Insured said that Snyder had stolen the policy from him. (Doc. 58-8, ECF p. 7, Richard Eckert Dep.).

The Insured died on October 18, 2015. (Doc. 68-7, ECF p. 3).

IV.  *Discussion*

   A.  *MONY's Motion for Summary Judgment*

   In her second amended answer, Eckert makes two counterclaims against

MONY on behalf of the Insured's estate.[2]  One is for breach of the contractual duty of

good faith and fair dealing and the other for breach of fiduciary duty.  On both of these

counterclaims, the loss is alleged to be the death benefit, valued by Eckert at about

$170,000.  (Doc. 48, Second Am. Answer, ¶¶ 72 and 78).

   In moving for summary judgment, MONY makes the following arguments.

First, since the Estate seeks as damages only the policy proceeds, under *Prudential Ins.*

*Co. of Am. v. Hovis*, 553 F.3d 258 (3d Cir. 2009), the counterclaims are not viable

against MONY as the interpleader of those proceeds.  Second, aside from any issue

concerning the change in ownership, there is no evidence that the Insured ever intended

to change the beneficiary of the policy from Snyder, so damages in the form of the policy

proceeds would be based on speculation.  Third, the counterclaim for breach of the

contractual duty of good faith and fair dealing fails because Eckert does not allege that

MONY breached any of the terms of the policy.  Fourth, the counterclaim for breach of

fiduciary duty lacks merit for the following reasons: (a) there is no viable fiduciary duty

claim directly against MONY; (b) Wilbert and Goetz were not MONY agents; (c) even if

---

   [2]  Both of the counterclaims are brought on behalf of Eckert individually and on behalf
of the Insured's estate.  At her deposition, Eckert stated the claims are being pursued solely
on behalf of the estate, not in her individual capacity.  (Doc. 58-3, ECF p. 44, Eckert Dep.).

they were MONY agents, neither Wilbert nor Goetz had a confidential relationship with the Insured; (d) even if they were MONY agents, and were in a confidential relationship with the Insured, neither Wilbert nor Goetz breached a fiduciary duty to the Insured.

We need not resolve all of these arguments. After review of the parties' briefs, we conclude MONY is entitled to summary judgment on the counterclaim for breach of the contractual duty of good faith and fair dealing because Eckert is basing the claim solely on a violation of the implied duty of good faith and fair dealing unconnected to MONY's performance under an actual provision of the policy. And MONY is entitled to summary judgment on the counterclaim for breach of fiduciary duty because even assuming that Wilbert and Goetz were MONY agents, they were not in a confidential relationship with the Insured, and even assuming that they were, neither Wilbert nor Goetz breached a fiduciary duty to the Insured.

We deal first with the counterclaim for breach of the contractual duty of good faith and fair dealing. Pennsylvania recognizes such a cause of action. *Hanaway v. Parkesburg Group LP*, 132 A.3d 461, 469 (Pa. Super. Ct. 2015). Recently, the Pennsylvania Superior Court described the cause of action as follows:

> [A] breach of the covenant of good faith and fair dealing is a breach of contract action, not an independent action for breach of a duty of good faith. *LSI Title Agency, Inc. v. Evaluation Servs.,* 951 A.2d 384, 391 (Pa. Super. 2008). The implied covenant of good faith and fair dealing attaches to existing contractual obligations; it does not add new contractual duties. In essence, the duty to act in good faith and deal fairly infuses the parties' performance of their express contractual obligations.

-22-

*Id.* at 471-72.  *See also Burton v. Teleflex Inc.*, 707 F.3d 417, 433 (3d Cir. 2013)(a plaintiff "cannot maintain an independent cause of action for the breach of the covenant of good faith and fair dealing under Pennsylvania law").

In her opposition brief, Eckert contends that MONY breached "the implied duty of good faith implied by law, as opposed to a specific contract provision or term, as suggested by MONY."  (Doc. 82, Br. in Opp'n at ECF pp. 5-6).  As MONY points out in its reply brief, this is an improper attempt to assert an independent action for breach of the implied duty of good faith and fair dealing.  Under Pennsylvania law, Eckert cannot bring a claim for breach of the implied duty of good faith and fair dealing without connecting it to MONY's performance of a contractual provision.  Since in bringing this claim Eckert specifically eschews reliance on MONY's performance of any contractual provision, her claim fails.

We turn now to the counterclaim for breach of fiduciary duty.  Cases involving fiduciary relationships are necessarily fact specific.  *Yenchi v. Ameriprise Fin., Inc.*, ____ A.3d ___, ____, 2017 WL 2644473, at *6 (Pa. 2017).  "[T]he critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side, which results in the effective ceding of control over decision-making by the party whose property is being taken."  *Id.* at ____, 2017 WL 2644473,  at *8 (internal quotation marks and quoted cases omitted). "A fiduciary duty may arise in the context of consumer transactions only if one party

cedes decision-making control to the other party." *Id.*, 2017 WL 2644473, at *8. The purchase of a life insurance policy is a consumer transaction. *Id.*, 2017 WL 2644473, at *1.

We agree with MONY that the claim fails because there is no evidence that Wilbert and Goetz were in a confidential relationship with the Insured. As MONY observes in part, Wilbert and Goetz were strangers to the Insured. They had met him only one time, at the September 4, 2014, meeting. There would thus be no evidence that they exhibited overmastering influence on the Insured or that the Insured exhibited weakness, dependence or trust, justifiably reposed. Eckert stated that the Insured hardly trusted anyone, except Lois Young from Prudential, but he had known her for thirty years. Further, as *Yenchi* recently made clear, the relationship must have resulted in the effective ceding of control over decision-making by the aggrieved party. Here, in this consumer transaction, Wilbert only made the recommendation to transfer ownership of the policy; the Insured actually made the decision to do so.

We also agree with MONY that the claim fails because, even assuming that Wilbert and Goetz were in a fiduciary relationship with the Insured, there is no evidence they breached a fiduciary duty arising from that relationship. It is undisputed that at the meeting the Insured said he was worried that Snyder would not receive the proceeds of the MONY policy. As a solution, Wilbert recommended a change in ownership so that it would be Snyder's property. Wilbert and Goetz were thus assisting the Insured by assuring that Eckert could not change the beneficiary. We observe that Eckert does not

dispute that the Insured had requested that Wilbert and Goetz communicate directly with Snyder about the policy and the change form because the Insured did not want Eckert to find out he was changing the ownership to Snyder.  (Doc. 58-9, ECF pp. 29, 31, 32, Snyder Dep.; Doc. 80-2, ESMF ¶ 50).[3]

In opposition, Eckert argues that her claim can proceed if she shows that the Insured trusted Wilbert and Goetz would act in good faith for his interest.  She is mistaken.  She would also have to show they occupied a position of advisor or counsellor to the Insured.  She has made no such showing.  See *Basile v. H&R Block, Inc.*, 777 A.2d 95, 102 (Pa. Super. Ct. 2001)(A confidential relationship can exist "wherever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest")(quoted case omitted).[4]

We will grant summary judgment in favor of MONY and against defendant Eckert on her two counterclaims.

---

[3]  Eckert's suggests that "it is not at all clear that" the Insured "told them he wanted to transfer ownership."  (Doc. 91, Eckert Reply Br. at ECF p. 24).  She relies on Goetz's recollection that he thought they were talking about a change in beneficiary.  (Doc. 58-12, ECF p. 17, Goetz Dep.).  Eckert's admission concerning how the Insured wanted the change form to be handled renders this argument meritless.

[4]  *Basile* dealt with a confidential relationship, but the "terms 'fiduciary relationship' and 'confidential relationship' may be used interchangeably."  *Yenchi*, ____ A.3d at ___, 2017 WL 2644473, at *3 n.5.

B.  *Eckert's and Snyder's cross-motions for summary judgment*

1.  *Whether the Insured made a valid gift of the policy*

Eckert has filed a motion for partial summary judgment for an order stating that the Insured was suffering from a weakened intellect in September 2014 and was in a confidential relationship with Snyder at that time.  Snyder has moved for summary judgment that the gift of the policy was valid, as well as on other claims Eckert says entitles her to the proceeds of the policy.  We start with whether the Insured made a valid gift of the policy.

Eckert and Snyder agree that the transfer of ownership of the policy was an inter vivos gift or transaction.  They differ on the analysis to be employed in determining whether the gift was valid.  Eckert asserts that under Pennsylvania law if it is shown that Snyder had a confidential relationship with the Insured, Snyder has the burden of showing that the Insured did not have a weakened intellect.  If she cannot prove that his intellect was not weakened, then the gift of the policy must be nullified.  Conversely, Snyder asserts that weakened intellect plays no role in determining whether a gift is valid, that Eckert is improperly bringing into a gift analysis part of the framework for deciding whether a testamentary transfer was valid.

We dealt with this issue when deciding Snyder's motion in limine.  We repeat our analysis from that motion.  Eckert asserts her approach is supported by three cases: *Estate of Reichel*, 400 A.2d 1268 (Pa. 1979), *Estate of Lakatosh*, 656 A.2d 1378 (Pa. Super. Ct. 1995), and *Owens v. Mazzei*, 847 A.2d 700 (Pa. Super. Ct. 2004).

Snyder says reliance on these cases is misplaced. She points out that the first two involved will contests. In a will contest, when the proponent of the will shows that it has been validly executed, the burden shifts to the challenger asserting undue influence to prove "that there was a confidential relationship, that the person enjoying such relationship received the bulk of the estate, and that the decedent's intellect was weakened." *Reichel*, 400 A.2d at 1270; *Lakatosh*, 656 A.2d at 1383. As to the third case, *Owens*, it did not involve a will contest but did involve a challenge to a bank account in which the decedent held the principal in trust for the two defendant bank officers as beneficiaries. In *Owens*, the court described this financial arrangement as a "poor man's will." 847 A.2d at 703. In those circumstances, the court analyzed the estate's challenge to the bank account under the framework for a will contest, treating the arrangement as a testamentary gift.

In contrast, Snyder argues that the instant case does not involve a transaction that is testamentary in nature. Instead, it involves an inter vivos gift, as the Insured transferred the policy to her during his lifetime. When an inter vivos gift is challenged, weakened intellect is not part of the analysis. Instead, the analysis begins with the donee establishing a prima facie case that the gift was made. *In re Clark's Estate*, 359 A.2d 777, 781 (Pa. 1976); *Banko v. Malanecki*, 451 A.2d 1008, 1010 (Pa. 1982). If the prima facie case is established, a presumption arises that the gift is valid. *In re Clark's Estate*, 359 A.2d at 781; *Banko*, 451 A.2d at 1010. The burden then shifts to the challenger to rebut the presumption by clear, precise and convincing evidence. *In*

*re Clark's Estate*, 359 A.2d at 781; *Banko*, 451 A.2d at 1010. The presumption is rebutted if the challenger shows that a confidential relationship between the donor and the donee existed at the time of the gift. *In re Clark's Estate*, 359 A.2d at 871; *Banko*, 451 A.2d at 1010. "[T]he burden then shifts to the donee to show that the gift was free of any taint of undue influence or deception." *In re Clark's Estate*, 359 A.2d at 871. *See also Banko*, 451 A.2d at 1010. To carry this burden, the donee must "show that the gift was the free, voluntary and intelligent act of" the donor. *In re Clark's Estate*, 359 A.2d at 871.

We agree with Snyder that this is the analysis we must use. We note that Eckert also relies on *Jackson Nat'l Life Ins. Co. v. Heyser*, No. 12-CV-5051, 2013 WL 5278240 (E.D. Pa. Sept. 19, 2013). However, the language she quotes from *Heyser* actually supports Snyder. In *Heyser*, the court had to decide whether to apply the testamentary gift framework or the inter vivos gift framework to a challenge to a life-insurance beneficiary designation. 2013 WL 5278240 at *4. In making that decision, the court reviewed the two different standards and noted that the framework for an inter vivos gift did not require the challenger to prove the donor's "weakened intellect." *Id.* We add that the court did apply the testamentary gift framework, but only because of the similarity between a life-insurance beneficiary designation and wills. 2103 WL 5278240,

at *5-6. Here, we deal with the gift of an insurance policy, not the designation of the beneficiary.[5]

Based on the inter vivos gift framework, Snyder argues she is entitled to summary judgment. First, the transfer of the policy establishes a prima facie case that the gift was made, thus leading to the presumption that the gift is valid. Eckert now has the burden to rebut the presumption by clear, precise and convincing evidence that a confidential relationship existed between the Insured and Snyder at the time of the gift. However, Eckert cannot make that showing. And even if she could, Snyder could in turn meet her burden to show that the gift was free of any taint of undue influence or deception.

"The circumstances in which confidential relationships have been recognized are fact specific and cannot be reduced to a particular set of facts or circumstances." *Yenchi*, ____ A.3d at ____, 2017 WL 2644473, at *6. Snyder relies on the following formulation. "[A] confidential relationship 'appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed[.]'" *Id.* at ____, 2017 WL 2644473, at *6 (quoted case omitted).

In asserting she did not have a confidential relationship with the Insured at the time of the gift, Snyder argues that Eckert appears to be relying on Snyder's periodic

---

[5] Eckert also relies on *Estate of Frisina*, 2014 Pa. Super. Unpub. Lexis 217 (Pa. Super. Ct. July 8, 2014). In that case, the court did analyze a challenge to an inter vivos gift under the testamentary gift framework. *Id.* at *57-58. However, *Frisina* is an unpublished decision which we need not consider.

management of his financial affairs until his marriage to Eckert as proof of a confidential relationship. Snyder points to Eckert's statement in her second amended answer that "[af]ter their divorce, from time to time he allowed her to continue to manage his financial affairs until his marriage to Pamela Eckert." (Doc. 48, Second Am. Answer ¶ 43). Snyder contends this does not rise to the level of overmastering influence. Moreover, since the Insured married Eckert in 2011, even if there were a confidential relationship based on her handling of his financial affairs, any such relationship ended well before the September 2014 transfer and so cannot support a finding of a confidential relationship at the time of the transfer.

Snyder's opposition to this argument is as follows. She acknowledges that a confidential relationship exists when on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed. As she argued above in connection with MONY's motion for summary judgment, she contends her claim can proceed if she simply shows that the Insured trusted Snyder would act in good faith in his interests. She is mistaken, as *Basile*, the case she cites, shows. *Basile* states that a confidential relationship can exist "wherever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Basile, supra,* 777 A.2d at 102 (quoted case omitted). Eckert thus has to show more than just that the Insured trusted Snyder would act in good faith in his interests. She would also have to show Snyder occupied a position of advisor or counsellor to the Insured.

In arguing that there was a confidential relationship, she lists the following and summarily argues they establish a confidential relationship.

- Snyder took the Insured for various medical visits between 2000 and 2010

- Snyder wrote a large number of business and personal checks for the Insured

- As far back as May 2006, the Insured was showing memory loss

- On May 30, 2006, the Insured authorized Dr. Moorthy to speak with Snyder rather than communicate with him directly about his medical care

- On October 7, 2005, the Insured signed a release allowing Snyder to communicate with his health insurance company

- In 2006, the Insured signed a power of attorney naming Snyder as his agent

- Snyder accompanied the Insured to his attorney's office and sat in on meetings with him

- On January 18, 2006, Snyder picked up the Insured's power of attorney from his lawyer, Dorothy Livaditis

- Snyder wrote a chronology of the Insured's history for him. That history refers repeatedly to his confusion in 2002 – 2006

- On May 24, 2013, the Insured again signed a power of attorney naming Carol Snyder as his agent.

- On August 26, 2013, the Insured and Snyder phoned MONY together, but Snyder cannot recall if it was about a third-party release form

- In December 2013, the Insured was involved in a motor vehicle accident and had no recall of what occurred prior to the accident

● On February 15, 2014, the Insured gave Snyder his original confidential documents to hold for him, including his wills and powers of attorney

● Snyder sent the Insured a series of notes and cards which said things like, "you are back in my life in a big way, and I intend to keep you there forever, You are and always will be the best person in my life . . . Remember we are together forever"

● On July 29, 2014, the Insured was evaluated by Dr. Lawrence McCloskey, a neuropsychologist. The Insured told the doctor that his wife paid the bills and managed his medication and medical appointments. He was unsure why he had carried a portable oxygen tank for the last couple of years. He was dependent on others to take medication and interface with his physicians. He was "unconcerned" about his decline in memory.

● At this evaluation, Eckert told Dr. McCloskey that the Insured's memory had been progressively declining for two years. He was frequently repeating himself, forgetting names, appointments, plans and events; misplaced objects and lost track of large sums of money. She stated that he forgot he had a bank account containing $150,000. He seemed unable to understand bills and paperwork even as well as he used to. He had a decreased interest in going out.

(Doc. 80, Eckert Opp'n Br. at 5-7).

Among other things, Eckert also relies, as described above, on the circumstances leading up to the transfer of ownership, the circumstances of the transfer, and the Insured's September 2015 assertion that he did not remember transferring the policy and did not recognize his signature on the change form. Further, she points to the three phone calls Snyder had with the AXA advisors on September 4, 2014, and Richard Eckert's testimony that his brother would not have understood the change form and

would not have transferred the policy out of concern for future medical needs. (Doc. 80, Eckert Opp'n Br. at 8-9). Finally, she relies on the phone calls Snyder made to the Insured on September 2, 2014, and September 4, 2014, at a time when Snyder knew Eckert was out of town[6] and that between August and September 2014 the Insured also talked to Snyder using McLane's phone, although the number of calls between the Insured and Eckert on McLane's phone is uncertain.

Countering, Snyder asserts that Eckert's claim fails because she has not shown that a confidential relationship existed at the time of the transfer of ownership in September 2014, that Eckert instead relies on events involving Snyder that occurred long before the transfer. More specifically, Snyder's involvement in the Insured's health care ended in 2010, and the May 2013 power of attorney for Snyder was replaced with the May 2014 power of attorney for Eckert. (Doc. 88, ECF p. 2). The evidence only shows that the Insured gave his personal papers to Snyder at some point in 2014, not at the time of the transfer. (Doc. 75, ECF p. 15). The notes and cards, even if sent during the Insured's marriage to Eckert, do not show overmastering influence, just a personal relationship. (Doc. 75, ECF p. 15). The two phone calls are indicative only of mere contact between two people, not a confidential relationship. (Doc. 75, ECF p. 16). At bottom, Snyder asserts Eckert has only established that there was a close personal relationship between the Insured and Snyder, not a confidential relationship, citing *Weir*

---

[6] Eckert says there were six phone calls between August 30, 2014, and September 6, 2014, but she is incorrect.

*by Gasper v. Estate of Ciao*, 556 A.2d 819, 826 (Pa. 1989)(close personal relationship was not a confidential relationship).

We agree with Snyder that Eckert has not shown by clear and convincing evidence that there was a confidential relationship between Snyder and the Insured.[7] As noted, the confidential relationship has to exist at the time of the gift. However, Snyder was no longer involved with the Insured's health care or his financial affairs after he began his relationship with Eckert in or around 2010. (Doc. 58, SSMF ¶ 10 and citations to the record specified therein). As Eckert herself admits, "After their divorce, from time to time he allowed her to continue to manage his financial affairs until his marriage to" Eckert. (Doc. 48, Eckert's Second Am. Answer ¶ 43). As Eckert also admits, "Snyder took" the Insured for "various medical visits" but only "between 2000 and 2010." (Doc. 80-2, ESMF ¶ 3). The phone calls between Snyder and the Insured do not show a confidential relationship because mere phone calls do not establish that Snyder occupied a position of advisor or counsellor to the Insured. They establish at most a personal relationship. *Weir*, 556 A.2d at 826. The same reasoning applies to the notes and cards Snyder sent the Insured and the Insured's giving his personal papers to Snyder.

_____

[7] In ruling on the summary-judgment motion, we must use the same evidentiary standard that would apply at trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)("the inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits"); *Northwestern Mut. Life Ins. Co., v. Babayan*, 430 F.3d 121, 129 (3d Cir. 2005). This means that because Eckert must prove there was a confidential relationship by clear and convincing evidence, Snyder can prevail by showing that the evidence in the record is not sufficiently clear and convincing to persuade a reasonable juror that there was such a relationship.

Neither do the circumstances surrounding the transfer of ownership establish a confidential relationship. As noted, Goetz arranged the September 4, 2014, meeting to review the policy, which was Wilbert's and Goetz's first and only contact with the Insured. Snyder was not present. According to Wilbert, the Insured volunteered that he was worried Snyder would not receive the proceeds of the MONY policy, but did not say anything about a change in ownership. Rather, it was Wilbert who recommended the change in ownership. There is thus nothing that occurred in connection with the transfer of ownership indicating that Snyder occupied a position of advisor or counsellor to the Insured.

Snyder handled the e-mailing of the change form, but Eckert admits that this was the result of the Insured's request that Wilbert and Goetz communicate directly with Snyder about the policy and the change form because the Insured did not want Eckert to find out he was changing the ownership to Snyder. (Doc. 58-9, ECF pp. 29, 31, 32, Snyder Dep.; Doc. 80-2, ESMF ¶ 50).[8]

Eckert relies on Richard Eckert's testimony that his brother would not have understood the change form and would not have transferred the policy out of concern for

---

[8] Citing *Heyser*, 2013 WL 5278240, at *6, Eckert says there was a confidential relationship because Snyder "completed the paperwork" on the transfer. (Doc. 80, ECF pp. 9-10). We disagree. There were other factors in *Heyser* besides having completed the paperwork. Moreover, Snyder did not complete the paperwork here. That was done by Wilbert, although Snyder did sign the change form.

Eckert also argues that the power of attorney the Insured gave Snyder in May 2013 is a clear indication of a confidential relationship. However, that power of attorney was replaced by the May 2014 power of attorney given Eckert.

future medical needs. However, the Insured's general position that he would not have transferred ownership of the policy for financial reasons does not necessarily mean that he would not have done so in any event. We note that Richard Eckert testified that he had "weekly, sometimes daily" conversations with the Insured in the last two years of his life, that they spoke frequently regarding financial and estate planning and that the Insured understood what he was doing. "He couldn't read very well, but he was always very sharp." (Doc. 58-8, ECF pp. 4-5, Richard Eckert Dep.). Richard Eckert did say his brother would not have been capable of filling out the change form, but he also testified that he would have understood what he was doing if he instructed someone else to change the ownership on the policy for him. (Doc. 58-8, ECF pp. 8-9, Richard Eckert Dep.). Further, the Insured told Richard Eckert that he wanted to leave some money to Snyder and was going to make her a beneficiary of one of his policies. (Doc. 58-8, ECF p. 6, Richard Eckert Dep.).

We add that this is not a situation where in September 2014 the Insured changed the beneficiary from someone else to Snyder. The MONY policy was issued on July 30, 1985, and Snyder was named the beneficiary at that time, with no evidence that the beneficiary designation ever changed. In fact, Eckert admits that she always knew that Snyder was the beneficiary of the MONY policy, and that while she did discuss it with the Insured, they did not do so in the two years before his death. She also did not press the Insured about it.

We conclude that Eckert has failed to provide clear and convincing evidence that the Insured was in a confidential relationship with Snyder. There was not sufficient evidence that Snyder exercised overmastering influence over the Insured or that the Insured exhibited weakness, dependence or trust, justifiably reposed in Snyder. Nor was there sufficient evidence that Snyder acted as an advisor or counsellor to the Insured.

Snyder next argues that even if Eckert could establish the Insured was in a confidential relationship with Snyder, Snyder can meet her burden of showing that there was no undue influence on the transfer. As noted above, if the challenger shows that a confidential relationship existed at the time of the gift, the burden then shifts to the donee to show that the gift was free of any taint of undue influence or deception. To carry this burden, the donee must "show that the gift was the free, voluntary and intelligent act of" the donor. *In re Clark's Estate*, 359 A.2d at 871.

Snyder argues she has made this showing here because, in part, as noted above, the record shows that at the September 4, 2014, meeting, it was Wilbert who suggested the transfer of ownership, after the Insured expressed concern that Snyder would not receive the proceeds of the MONY policy. Further, the Insured told McLane on the same day as the meeting that it was his intent to transfer ownership of the policy to Snyder. The Insured also told McLane why he was doing it, that at that time Eckert had power of attorney for the Insured and he wanted to make sure Snyder got the policy so that the beneficiary could not be changed. He also told Suzanne Eckert the same thing

after Eckert learned in September 2015 of the change in ownership, that the Insured had signed the policy over to Snyder to ensure that she would get the benefit and that Eckert would not be able to use her power of attorney to change the beneficiary or cash in the policy.[9] We believe this evidence establishes that there was no undue influence in the transfer of ownership.

> 2. *Whether the Insured was competent to make the transfer of ownership*

Snyder argues there is no evidence that the Insured was not competent to transfer ownership of the policy. "[W]here mental competency is at issue, the real question is the condition of the person at the very time he executed the instrument or made the gift in question." *Sobel v. Sobel*, 254 A.2d 649, 651 (Pa. 1969). Competency is presumed and the burden is on the challenger to establish otherwise. *Id.* The challenger must present evidence of incompetency that is clear, precise and convincing. *Cardinal v. Kindred Healthcare, Inc.*, 155 A.3d 46, 50 (Pa. Super. Ct. 2017). If the challenger presents evidence "tending to show lack of competency for a reasonable time before and after the critical time," the burden of proof shifts "to the person who alleges that the transaction occurred during an interval when the person was mentally competent." *Sobel*, 254 A.2d at 651. "[A] person's mental capacity is best determined by his spoken words and his conduct, and . . . testimony of persons who observed such

---

[9]  Snyder points out that McLane (Doc. 58-5, ECF p. 14) and Suzanne Eckert (Doc. 58-6, ECF p. 7) were beneficiaries under the Insured's will so they were testifying against their own interests when giving testimony favorable to Snyder.

conduct on the date in question out-ranks testimony as to observations made prior to and subsequent to that date." *Id.* "[M]ere weakness of intellect resulting from sickness or old age is not legal grounds to set aside an executed contract if sufficient intelligence remains to comprehend the nature and character of the transaction, and no evidence of fraud, mutual mistake or undue influence is present." *Cardinal*, 155 A.3d at 526 (internal quotation marks and quoted case omitted).

Here, Snyder asserts there is no evidence to rebut the presumption of competency. There was no clear evidence that the Insured had dementia and he was never adjudicated incompetent. Additionally, the personal observations of witnesses shows he was competent. Wilbert and Goetz, the AXA advisors, testified at that at the meeting on September 4, 2014, the day before the Insured signed the change form, he was very coherent and had no cognitive impairment. Asnoted above, McLane testified the Insured told him the day of the meeting that it was his intent to transfer ownership of the policy to Snyder. The Insured also told him why he was doing it, that at that time Eckert had power of attorney for the Insured and he wanted to make sure Snyder got the policy so that the beneficiary could not be changed. As also noted, Suzanne Eckert testified that he told her after Eckert learned in September 2015 of the change in ownership that he had signed the policy over to Snyder to ensure that she would get the benefit and that Eckert would not be able to use her power of attorney to change the beneficiary or cash in the policy. We agree with Snyder that this evidence establishes

that the Insured comprehended the nature and character of the transaction and was competent to make it.

In opposition, Eckert argues that "[e]ven if a testator can understand legal documents and possess testamentary capacity, he can still suffer from a weakened intellect." (Doc. 80, Opp'n Br. at ECF pp. 10-11). We reject this argument because weakened intellect plays no part in analyzing whether an inter vivos gift was valid. We add that the Insured was not a testator in regard to the gift of the policy.

3. *Snyder's divorce from the Insured does not render invalid her beneficiary designation as the statutory section dealing with the effect of a divorce on a beneficiary designation does not apply retroactively*

Eckert asserts that under 20 Pa. Cons. Stat. Ann. § 6111.2, Snyder's divorce from the Insured renders invalid her beneficiary designation. In part, section 6111.2 directs the way life insurance proceeds are to be distributed when a spouse has been designated the beneficiary of an individual's life insurance policy and at the time of the individual's death he is divorced from that spouse. *Id.* § 6111.2(a)(2) and (3)(i). As a general rule, such a designation if "revocable by the individual at the individual's death shall become ineffective for all purposes and shall be construed as if the spouse or former spouse had predeceased the individual . . . ." *Id.* § 6111.2(b).[10]

---

[10] We quote the current version of section 6111.2, but it is not materially different from its language as originally enacted.

Section 6111.2 was enacted on December 16, 1992. Snyder was designated the beneficiary of the MONY policy on July 30, 1985, and there is no evidence that the beneficiary designation was ever changed. In moving for summary judgment, Snyder argues that section 6111.2 does not divest her of her beneficiary status because the section does not apply retroactively to a designation of beneficiary occurring before the statute's enactment. She cites *Parsonese v. Midland Nat'l Ins. Co.*, 706 A.2d 814 (Pa. 1998), in support. In *Parsonese*, the Pennsylvania Supreme Court held that it would be unconstitutional under the contract clauses of the federal and state Constitutions to apply section 6111.2 to beneficiary designations occurring before its effective date. 706 A.2d at 819. In that case, the beneficiary designation was made on August 27, 1992, so section 6111.2 could not be applied to deprive the ex-wife of the life insurance proceeds.

Eckert counters that *In re Estate of Hoffman*, 54 A.3d 903 (Pa. Super. Ct. 2012), requires the opposite result. We agree with Snyder that *Hoffman* is distinguishable. In *Hoffman*, the decedent, Robert Hoffman, purchased the life insurance policy on August 12, 1992, naming his then spouse as the beneficiary. They were divorced. Later, on December 21, 2003, he changed the beneficiary to Hoffman, his spouse at that time. On August 12, 2008, he divorced Hoffman. After Robert Hoffman's death, the insurance company notified Hoffman that it would not pay her the policy proceeds because section 6111.2 extinguished her rights in the policy. Citing *Parsonese*, Hoffman argued that applying section 6111.2 to her would be improperly

-41-

retroactive because the policy had been purchased before the effective date of the statute. The Pennsylvania Superior Court rejected the argument because in *Parsonese* the supreme court had made clear that the relevant date for the retroactivity analysis was the date of the beneficiary designation, not the date the policy had been purchased. 54 A.3d at 906. Since Hoffman was designated as the beneficiary on December 21, 2003, after the effective date of the statute, section 6111.2 applied. In the instant case, as noted above, Snyder was designated the beneficiary before the effective date of the statute. Hence *Hoffman* does not apply here.

4. *The property settlement agreement does not divest Snyder of beneficiary status because the agreement does not specifically waive Snyder's interest in the policy proceeds*

Sections 6111.2(b)(1) and (3) provide, as exceptions to the general rule invalidating a spousal designation after a divorce, that the designation does survive the divorce, either based on the wording of the designation, or a written contract between the divorcing parties. "Under the plain language of Section 6111.2, the parties must affirmatively indicate in their written contracts that the designation shall survive the divorce, and, in the absence of such wording, the former spouse is treated as if she predeceased the decedent." *Hoffman*, 54 A.3d at 907.

As also acknowledged in *Hoffman*, 54 A.3d at 907, before section 6111.2 was enacted, a property settlement agreement resolving property rights between divorcing parties had to include an explicit waiver of any interest in life insurance

proceeds if a divorcing party was to be divested of that interest.  *See Equitable Life Assurance Soc'y v. Stitzel*, 445 A.2d 523, 525 (Pa. Super. Ct. 1982).  Here, since section 6111.2 does not apply, and the property settlement agreement does not specifically address the policy.  Eckert therefore cannot rely on the property settlement agreement to divest Snyder of her interest in the policy.

V.   *Conclusion*

Based on the foregoing, we will grant MONY summary judgment against defendant Eckert on her two counterclaims against it.  We will grant Snyder summary judgment on Eckert's crossclaim against her and in Snyder's favor on her crossclaim against Eckert.  We will deny Eckert's motion for partial summary judgment against Snyder.  Additionally, since we have decided that Snyder is entitled to the proceeds of the policy, instead of ordering MONY to pay the proceeds into the court registry, we will order it to pay the proceeds to Snyder.

We will issue appropriate orders.


/s/William W. Caldwell
William W. Caldwell
United States District Judge


July 31, 2017